IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

| | |
|---|---|
| **JESUS CORTEZ RIVERA, et al.,** | |
| Plaintiffs, | |
| v. | **CIVIL ACTION NO.: 3:21-CV-132 (GROH)** |
| **ALTEC, INC., et al.,** | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Pending before the Court is a Motion [ECF No. 115] to Compel filed on March 16, 2023, by Defendants Altec, Inc. et al. (collectively "Altec").[1] On April 14, 2023, nonparty All Reliable Services, Inc. and All Railroad Services, Corp. (collectively "ARS") filed a Response in Opposition [ECF No. 128], and Altec filed a Reply [ECF No. 129] on April 18, 2023. On April 20, 2023, the Court held an evidentiary hearing and oral argument on Altec's Motion. For the reasons outlined below, Altec's Motion [ECF No. 115] to Compel is **DENIED**.

### II. BACKGROUND

This is a products liability action arising from an incident in Shepherdstown, West Virginia that resulted in personal injury. On July 15, 2019, Plaintiff Jesus Cortez Rivera, an employee of ARS, was trimming trees on the elevated platform of a bucket truck manufactured by Altec. The truck tipped over/collapsed onto its side, resulting in serious injury to Mr. Rivera. Plaintiff claims Altec is responsible for his injuries because its truck was improperly designed, its slope indicator was inaccurate, or its owner's manual was

---

[1] On March 21, 2023, Judge Gina M. Groh entered an Order [ECF No. 118] of Referral on the Motion.

inadequate, misleading, or not provided in Spanish. Specifically, as to the alleged improper design, Plaintiff claims the truck's design was defective because it was prone to tip toward the narrower "modified A-frame" outriggers. As part of its defense, Altec claims "the bucket truck tipped over because Plaintiff positioned it improperly with both right-side outriggers off the paved road, thus tilting the truck too far to the right (i.e. more than 5 degrees past level) and rendering it unstable." ECF No. 115 at 4. Altec further claims that "Plaintiff most likely positioned Altec's bucket truck improperly because both he and ARS failed to read the owner's manual and ARS failed to provide him training on the new truck." Id.

On March 25, 2022, the Court dismissed ARS without prejudice after Plaintiffs failed to amend the complaint to assert a claim for deliberate intent against ARS under West Virginia Code § 23-4-2(d)(2). Since the dismissal, ARS has agreed to cooperate with the remaining parties during discovery without the need for Rule 45 subpoenas.

As part of its initial investigation of Plaintiff's accident, ARS Safety Department Manager Benjamin Switzer prepared an "Initial Root Cause Report" dated July 22, 2019, which determined that "identifying a root cause with available information is currently inconclusive" and stated that "third-party assistance with the proper credentials and expertise has been requested to conduct further investigation." ECF No. 115 at 77-100. ARS, through outside counsel, then hired an engineer, Gary Werkhoven, to conduct an independent, third-party review of its accident reconstruction and related stability testing on a similar "sister" truck. Gary Werkhoven's findings and conclusions were submitted in the "Expert Report," dated August 5, 2019. The details and findings of the "Initial Root Cause Report" and the "Expert Report" were then incorporated into an

2

updated "Final Root Cause Report" prepared by Mr. Switzer on August 14, 2019. ECF No. 115 at 37-63.

On October 15, 2022, Altec requested that ARS produce personnel files, training materials, and inspection materials. On October 24, 2022, ARS produced responsive documents and a privilege log. Included in the documents produced to Altec was the unredacted "Initial Root Cause Report," which includes on-site pictures, measurements, and other first-hand details and accounts of the incident. In its privilege log, ARS noted that it would not produce the Final Root Cause Report and the Expert Report because they were protected work product. ECF No. 115 at 30. Further, in the privilege log, ARS asserts that the Expert Report, which is incorporated into the Final Root Cause Report, was procured for consultation purposes in anticipation of litigation. Id. The privilege log also states that both the Expert Report and Final Root Cause Report were sent to ARS Counsel, William MacMinn. Id.

Following receipt of ARS's privilege log, Altec requested that ARS produce both the Final Root Cause Report and the Expert Report as they are relevant to the claims and defenses at issue. The parties conferred on the dispute and while ARS refused to hand over the Expert Report, it did agree to produce a redacted version of the Final Root Cause Report on December 6, 2022.

Altec now moves this Court to compel ARS to produce: (1) an unredacted version of the Final Root Cause Report; (2) the Expert Report; and (3) "all notes prepared and measurements taken by ARS employees and representatives as part of its investigation of Plaintiff's July 15, 2019 accident."[2] ECF No. 115 at 1. While Altec's

---

[2] The parties have barely addressed the production sought in (3), and it was not addressed at the April 20, 2023, evidentiary hearing. Altec's brief reduces the request to "all notes and all supporting

3

Motion to Compel was brought pursuant to Federal Rule of Civil Procedure 37, the parties ultimately agreed at the April 20, 2023, hearing that Rule 37 does not apply to nonparty document requests, and that Rule 45 governs this Motion.[3] For the sake of judicial economy, the parties have agreed to proceed with the motion hearing and submit the dispute to the Court for resolution without the necessity and cost of a formal Rule 45 subpoena and written objections. Finally, per the Court's request at the hearing, ARS provided the Court with the Expert Report and an unredacted version of the Final Root Cause Report for *in camera* review.

### III.  DISCUSSION

To begin, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The factors governing proportionality include: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Id.

---

measurements and data collected by ARS to support the Reports." Given both parties failure to address the information sought in (3), the Court will only address the production of the Expert Report and Final Root Cause Report.

[3] A motion to compel a discovery response from a nonparty under Rule 37 is limited to situations where "(i) a deponent fails to answer a question asked under Rule 30 or 31 [or] (ii) a corporation or other entity fails to make a designation under Rule 30(b)(6) or 31(a)(4)." Fed. R. Civ. P. 37(a)(3)(B)(i)-(ii). A motion to compel the *production of documents* under Rule 37 is explicitly reserved for when "a *party* fails to produce documents … as requested under Rule 34." See Fed. R. Civ. P. 37(a)(3)(B)(iv). Rule 34(c) authorizes a party to issue a subpoena duces tecum to a nonparty for the production of documents pursuant to Rule 45. United States v. Meridian Senior Living, LLC, 2018 WL 5723930, at *1 (E.D.N.C. Nov. 1, 2018); see also Fed. R. Civ. P. 34(c) ("As provided in Rule 45, a nonparty may be compelled to produce documents and tangible things."). In other words, Rule 45 is the proper vehicle for a party to seek the production of documents from a nonparty. Boukadoum v. Hubanks, 239 F.R.D. 427, 429 (D. Md. 2006). And when a nonparty fails to produce documents in response to a subpoena either by not responding within the applicable time frame or by serving written objections on the party, Rule 45 allows the party to enforce the subpoena by moving the court for an order compelling production. Fed. R. Civ. P. 45(d)(2)(B).

"Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation … by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). "But, subject to Rule 26(b)(4), those materials may be discovered if: (i) they are otherwise discoverable under Rule 26(b)(1); and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Id. This rule is commonly referred to as the work product doctrine.[4] Nonparties may claim subpoenaed documents as work product as well pursuant to Rule 45(e)(2)(A), and the Rule 26(b)(3) standard described above applies. See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co., 967 F.2d 980, 984 (4th Cir. 1992) (applying Rule 26(b)(3) standard to a nonparty asserting work product privilege in relation to a subpoena duces tecum).

As an initial matter, there is not much dispute, if any, among the parties that if the Expert Report and Final Root Cause Report ("the Reports") are not considered work product under Rule 26(b)(3), they would otherwise be discoverable.[5] The Reports are clearly relevant to Altec's defense of this case because they may offer insight into what caused the bucket truck to tip over, resulting in injury to Mr. Rivera. Indeed, the redacted Final Root Cause Report includes the conclusion that the "root cause of this incident was due to the improper and misunderstood setup of the Altec LR7." The disclosure of the underlying reasons for this finding may help Altec determine (and

---

[4] "Federal law applies in consideration of work product issues in Federal Courts." Westfield Ins. Co. v. Carpenter Reclamation, Inc., 301 F.R.D. 235, 248 (S.D.W. Va. 2014).

[5] Although misstated and cited incorrectly, ARS made a cursory reference in both its brief and at oral argument to Rule 26(b)(4)(D), which is titled "Expert Employed Only for Trial Preparation." This rule, however, only applies to situations where a party is seeking to discover "facts known or opinions held by an expert" through "interrogatories or deposition." See Fed. R. Civ. P. 26(b)(4)(D). Thus, this "exceptional circumstances" inquiry briefly referenced by ARS is not relevant to the dispute before the Court because Altec is seeking discovery via document production, not through "interrogatories or deposition." Id.

5

ultimately implement as a defense) that the truck did not turn over because of a defect but rather from user error. Likewise, the production of the Reports is proportional to the needs of Altec's defense as the issue of causation is important to the case and the benefit of these relevant documents to Altec's defense outweighs the minimal burden or further expense to ARS in producing it. In short, given the Reports are "otherwise discoverable under Rule 26(b)(1)," the remaining issues before the Court are: (1) whether the Expert Report and Final Root Cause Report were "prepared in anticipation of litigation" and, if so, (2) whether Altec has a "substantial need" for the Reports to "prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." ARS, as the party asserting the protection, has the burden of proving the applicability of the work product doctrine, i.e., that the Reports were prepared in anticipation of litigation. See Westfield Ins. Co., 301 F.R.D. at 249. Once proven, the burden shifts to Altec to prove substantial need for the Reports and an inability to obtain their substantial equivalent by other means without undue hardship. Id.

### A. The Reports were prepared in anticipation of litigation.

In order to be protected as work product, the document "must be prepared because of the prospect of litigation" when the preparer faces an actual or potential claim following an actual event that "reasonably could result in litigation." Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Murray Sheet Metal Co., 967 F.2d 980, 984 (4th Cir. 1992). "Materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in anticipation of litigation within the meaning of Rule 26(b)(3)." Id. Therefore, the Court

6

must determine "the driving force behind the preparation of each requested document" to resolve a work product dispute. Id.

In determining whether a document is created in the ordinary course of business or in anticipation of litigation for purposes of applying the work product doctrine, the Court applies a "case-by-case" approach and considers the following factors: the nature of the documents, the nature of the litigation, the relationship between the parties, the involvement of counsel, and the time when the document was created. Kidwiler v. Progressive Paloverde Ins. Co., 192 F.R.D. 536, 542 (N.D.W. Va. 2000). The Court "must carefully analyze the factual circumstances under which the requested documents were created, consider the purpose of the representatives in preparing the requested documents, and examine the documents themselves." Nicholas v. Bituminous Cas. Corp., 235 F.R.D. 325, 332 (N.D.W. Va. 2006).

Through its production of the redacted Final Root Cause Report, ARS has narrowed its original contention that the entire Final Root Cause Report is protected work product. It now essentially contends that the hiring of the expert engineer was for the purpose of litigation, so the Expert Report is work product and by extension the sections of the Final Root Cause Report that incorporate the expert's findings (or rely upon them) are also work product. Altec, in an effort to show these reports were prepared for business purposes rather than in preparation for litigation, points to language from the Final Root Cause Report that describes its purpose as "to provide relevant information as it pertains to the specific incident and a plan to prevent future reoccurrence." Altec also points out that the Initial Root Cause Report states that the purpose of hiring an expert to prepare a third-party report was "to conduct further

7

investigation of the ALTEC LR7's operational safety and reliability."[6] ARS asks the Court to look beyond these "cherry-picked" statements and consider the overall nature of the accident, the entire context of the documents, the hiring of the expert, and the involvement of counsel.

The Court has considered the evidence presented and reviewed the withheld documents *in camera*. The undersigned finds that while there may have been some safety-related motivation in the preparation of the Expert Report and Final Root Cause Report, the driving force behind the preparation of the Reports was the prospect of litigation. In other words, the Reports were prepared because of the prospect of litigation when ARS faced a potential claim after one of its trucks rolled over, seriously injured an employee, and downed electrical lines, resulting in a disruption of service. All of which the Court finds are events that "reasonably could result in litigation."

The nature of the July 15, 2019, accident leads to the inference that the driving force for the preparation of the August 5, 2019, Expert Report and the August 14, 2019, Final Root Cause Report were for litigation purposes. In mid-July of 2019, a bucket truck deployed by ARS tipped over while stationary, resulting in a dangerous situation where an ARS employee was flung to the ground from an elevated position. In addition to Mr. Rivera's injuries, the truck's roll over damaged the nearby power lines resulting in a power outage to local customers. The uncommon nature of this "actual event" combined with the seriousness of Mr. Rivera's injury, the property damage, and the possibility for future incidents with the potential to cause further harm, leads to the reasonable conclusion that litigation was likely on the horizon. It makes sense why ARS

---

[6] Altec, of course, does not have access to the Expert Report, so it is unable to point to specific language from it.

would want to hire an expert shortly after the incident as it continued to gather facts and seek opinions on causation so that counsel could assess potential claims and defenses. This step of hiring an outside expert appears to go beyond what a company might normally do in the ordinary course of business following a workplace injury and damage to company property.

Moreover, the involvement of counsel in the preparation of these documents evinces a litigation-driven purpose. ARS Exhibit 1 and 2, which counsel for ARS presented to the Court as evidence at the hearing, demonstrate that the expert, Gary Werkhoven, was retained by ARS counsel, William MacMinn, and that the Expert Report was to be addressed to Mr. MacMinn.[7] See ECF Nos. 132-1, 132-2. The privilege log further confirms that Mr. MacMinn received the Expert Report as well as the Final Root Cause Report. See ECF No. 115 at 30.

Additionally, there is evidence within the redacted Final Root Cause Report that demonstrates counsel's involvement in the Reports and that ARS anticipated litigation at the time these reports were prepared in August of 2019:

> Note: Measurements and Values while close may not exactly match the report provided by Gary Werkhoven, PE. His report will be provided once received from our company's legal support and permitted to share depending on requirements as set forth by attorney client privileges.

See ECF No. 115 at 60. The expressed safety considerations described in the Final Root Cause Report—preventing future reoccurrence—naturally share parallel litigation-focused motivations by ARS in the prevention of future lawsuits involving further

---

[7] Through its *in camera* review, the Court can confirm that the Expert Report was addressed to ARS Counsel, Mr. MacMinn.

9

employee injury, civilian injury, and property damage if another ARS-operated bucket truck were to tip over and cause harm.[8]

In sum, the evidence presented supports a finding that the Expert Report and Final Root Cause Report were prepared because of the prospect of litigation, and thus, are protected work product. The Court now turns to the next question: whether Altec has a substantial need for the requested information that would overcome the work product protection.

### B. Altec cannot demonstrate a substantial need.

As mentioned previously, protected work product documents may be discovered if Altec "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A). As the Advisory Committee noted when enacting Rule 26(b)(3), the substantial need inquiry "reflects the view that each side's informal evaluation of its case should be protected, that each side should be encouraged to prepare independently, and that one side should not automatically have the benefit of the detailed preparatory work of the other side." Sanford v. Virginia, 2009 WL 2947377, at *2 (E.D. Va. Sept. 14, 2009). A party seeking disclosure of protected work product "must demonstrate that its need is truly substantial, and that there is no reasonable substitute for the documents." Id.

According to Altec, the Final Root Cause Report redacts "crucial summary findings and conclusions found in the Expert Report and other exact details of the

---

[8] The Court notes that the truck involved in the accident was a new model that had only recently been acquired by ARS and placed into service. This accident brought the safety of this model into question and ARS temporarily suspended its use.

10

findings resulting from the stability testing." Additionally, certain "corrective actions" were redacted which may have altered those found in ARS's Initial Root Cause Report. Altec had its expert engineer, Dr. James Sprague, testify at the hearing as to why he, and by extension, Altec needs the Expert Report and an unredacted version of the Final Root Cause Report to assist in their own causation determinations. The Altec expert testified that with the information he currently has access to, he is unable to make a definitive determination on what caused the truck to tip over. The Altec expert testified that getting access to the Reports would allow him to see what information Mr. Werkhoven relied on and analyze the underlying reasoning for why ARS went from its original inconclusive causation findings to its ultimate conclusion in the Final Root Cause Report that the "root cause of this incident was due to the improper and misunderstood setup of the Altec LR7." The Altec expert noted that being able to compare data points and see if Mr. Werkhoven relied on any additional information than what Altec currently has access to would be helpful to his own causation assessment.

But as ARS points out, there are other sources of incident descriptions, photographs, and measurements taken on the scene that Altec has been given, which minimizes Altec's need for the information in the Reports. In fact, just days after the incident, well before any litigation commenced, Altec employees were able to inspect the damaged truck at an ARS location as well as the scene of the incident. Altec points out that when they were able to inspect the scene, the truck had already been removed. But, this fact does not demonstrate a need for the Expert Report because Mr. Werkhoven was also not able to inspect the scene with the truck still there. Altec even prepared its own "Limited Incident Report Involving Altec Equipment" on July 25, 2019,

11

detailing Altec's own investigative findings. Additionally, Altec has access to the Initial Root Cause Report, which Mr. Werkhoven relied on as a source of information in his Expert Report, and Altec has a redacted version of the Final Root Cause Report, both of which go into extensive detail about the incident and include photos and relevant measurements.

At the hearing, Altec clarified that it did not have access to the "sister truck" owned by ARS that Mr. Werkhoven used for his stability testing. However, Altec is the manufacturer and should have access to all of its prior testing on the vehicle model before the product launched.[9] The Court is simply not convinced that Altec has a "substantial need" for these Reports when Altec presumably has access to the same information the ARS expert had and has hired their own expert to conduct the necessary tests, who can come to his own independent conclusions. Just because Altec's expert desires to analyze Mr. Werkhoven's findings as to causation to either confirm or rebut the same does not mean Altec is entitled to ARS's work product. In sum, Altec should have the underlying facts and data necessary to obtain the substantial equivalent of the Reports by other means without undue hardship, and likewise, has not shown a substantial need for the Reports. Accordingly, Altec's Motion to Compel shall be denied.

---

[9] Altec also mentioned that they no longer make the exact truck model at issue, but it seems at least for some time after this incident Altec would have had the ability to conduct their own stability testing on a similar vehicle in Altec's possession, given it was the manufacturer.

## IV.     CONCLUSION

For the reasons set forth above, Defendants' Motion [ECF No. 115] to Compel is **DENIED.** In accordance with this Court's discretion, each party shall bear its own attorney's fees and costs incurred as a result of this Motion.

Any party may, within fourteen (14) days of this Order, file with the Clerk of the Court written objections identifying the portions of the Order to which objection is made, and the basis for such objection. Fed. R. Civ. P. 72(a). A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(a).

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals**. See 28 U.S.C. § 636(b)(1); Wright v. Collins, 766 F.2d 841, 845–48 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); see also Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Order to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**DATED:** April 26, 2023

_____
ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE